## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

| | |
|---|---|
| _____ )<br><br>E.H., by and through his next friend, Lula Henry, )<br>on behalf of himself and all similarly situated )<br>students, )<br> )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>MISSISSIPPI DEPARTMENT OF EDUCATION, )<br> )<br>Defendant. )<br> )<br>_____ ) | SOUTHERN DISTRICT OF MISSISSIPPI<br>F I L E D<br><br>JUL 10 2012<br><br>J T NOBLIN CLERK<br>BY_____ DEPUTY<br><br>Case No. 3:12CV474 DPJ-FKB |

### COMPLAINT

1.      This is a class action lawsuit filed on behalf of children with disabilities in the Jackson Public School District ("JPS") to hold the Mississippi Department of Education ("MDE") accountable for ensuring that they receive the free appropriate public education they are entitled to receive under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*  For years, students with disabilities throughout JPS have been denied the educational and supportive services they need to achieve academically, and have been removed from their schools and forced into substandard segregated settings with little to no appropriate academic programming and related services.  In September 2010, Plaintiff and a class of similarly situated JPS students filed a systemic state administrative complaint against JPS which alerted MDE to numerous systemic violations of the IDEA, and requested MDE's assistance in investigating and ensuring correction of both the individual and systemic violations that prevented them from obtaining an appropriate education from JPS.  Although MDE

substantiated each and every one of the violations detailed in Plaintiff's administrative complaint, JPS has continued to violate the rights of the Plaintiff and the class of similarly situated students.

2.      Over the past twenty-two months, JPS has sought only to evade responsibility for these violations, and has openly and defiantly refused to provide the Plaintiff and similarly situated students with the appropriate services they are entitled to receive under the IDEA. Sadly, despite having the authority and obligation under federal and state law to hold JPS accountable for these violations and ensure the provision of critical special education and related services to children with disabilities, MDE has exhibited complete indifference to Plaintiff's pleas for relief, and has failed to take appropriate action to compel JPS to correct the individual and systemic violations of the IDEA that harm thousands of JPS's most vulnerable students.

3.      JPS's systemic failure to comply with the IDEA greatly diminishes the likelihood that thousands of JPS students will realize their full academic potential and achieve a successful transition from high school. The devastating impact of JPS's unlawful conduct is borne out in the District's dismal graduation rate for students with disabilities: less than ten percent of students with disabilities graduate from JPS. During the 2010-2011 school year, only 9% of eighth grade students with disabilities scored proficient or above in state-wide science testing, while only 4% of eighth grade students with disabilities were considered proficient in language arts as measured on the Mississippi Curriculum Test. Plaintiff and the proposed class are merely seeking to claim their rightful opportunity to make meaningful behavioral and academic progress to achieve and succeed academically, and cannot allow more time to pass for JPS to continue to treat their education as expendable. The consequences of continued noncompliance by JPS, and MDE's refusal to ensure compliance, are serious and profound for Plaintiff and the class.

2

4.     In 1975, Congress enacted what is now called the IDEA to end the longstanding failure of schools to meet the educational needs of students with disabilities.  The statute is aimed at correcting the historic exclusion of students with disabilities from the classroom, and ensuring the provision of an appropriate education to all students with disabilities.  To achieve this goal, state education agencies such as MDE are required to ensure that local school districts have policies and procedures in place to ensure that students with disabilities receive a free appropriate public education ("FAPE").  This entails providing each child with a disability with an individualized education program ("IEP") that is reasonably calculated to confer meaningful educational benefit.  IEPs must also include the provision of any related services, such as counseling and speech therapy, necessary to ensure that a child can make academic and behavioral progress; and must also provide for specific behavioral interventions when it is determined that a child's behavior is interfering with his/her ability to make academic and/or behavioral progress. For some students, IEPs must provide for transition services to facilitate a successful transition from high school, and for extended school year ("ESY") services over the summer months.  The IDEA also mandates that students be served alongside their typical peers in the least restrictive environment ("LRE"), and includes numerous procedural safeguards to protect children from school discipline practices that punish them for behaviors related to their disabilities.

5.     The Mississippi Department of Education bears the ultimate responsibility for ensuring that local school districts such as JPS comply with the IDEA and for ensuring that all students with disabilities, regardless of the nature or severity of the disability, receive FAPE in the least restrictive environment.  Despite this clear federal mandate, the Defendant has utterly failed Plaintiff and similarly situated students with disabilities in JPS.  Nearly two years ago, in

response to a class-wide state administrative complaint filed by the Plaintiff and a class of similarly situated students, MDE documented a host of systemic IDEA violations within JPS that resulted in the denial of FAPE to potentially thousands of students.  Since that time, MDE has failed to properly exercise its general supervisory responsibilities under IDEA, including its monitoring and enforcement authority, and has thereby permitted JPS to perpetuate the same denials of FAPE, further squandering the valuable and limited time that students with disabilities have to obtain a free appropriate public education.

6.      Plaintiff E.H. is a JPS student with a disability who has been denied the right to receive a free appropriate public education and who has experienced excessive disciplinary removals from school.  On behalf of himself and the same class of similarly situated students identified in the 2010 state administrative complaint, Plaintiff seeks prospective injunctive relief ordering Defendants to comply with their federal legal mandate to monitor JPS and enforce compliance with the IDEA so that Plaintiff and the proposed class may receive the free appropriate public education they are entitled to receive by law.  Declaratory and injunctive relief is necessary to ensure enforcement of Plaintiff's rights under the IDEA.

## JURISDICTION

7.      This action arises under the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1400 *et seq.*  Jurisdiction is conferred upon this Court by 20 U.S.C. § 1415(i)(2)-(3)(A) which provides the district courts of the United States with jurisdiction over actions brought under the IDEA without regard to the amount in controversy, and 28 U.S.C. § 1331, based upon the federal questions raised herein.

8.      Plaintiff and the class he seeks to represent have no adequate remedy at law and have suffered and will continue to suffer irreparable harm unless the Defendant, including its

agents, representatives and/or employees, is permanently enjoined from continuing its unlawful practices. This Court is authorized to grant declaratory and injunctive relief to Plaintiff and the proposed class under 28 U.S.C. § 2201 and § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

**VENUE**

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in this district.

**PARTIES**

10.      **Plaintiff E.H.** is a sixteen year old JPS student who will enroll in the tenth grade in August 2012. E.H. initially enrolled in JPS in the first grade, but was then home-schooled for part of the first grade and the entire second grade. He returned to JPS in August 2004 to begin the third grade. E.H. has been identified under IDEA as a student with a specific learning disability in basic reading and reading comprehension. He brings this action by and through his mother and next friend, Lula Henry, in accordance with Federal Rule of Civil Procedure 17(c).

11.      **Defendant Mississippi Department of Education** is responsible for administering all public education services in Mississippi. Miss. Code Ann. § 37-3-5. MDE is the federally designated state educational agency as that term is defined in 20 U.S.C. § 1401(32). As such, MDE is also responsible for administering a program of special education services for children with disabilities throughout Mississippi that is designed to enable children with disabilities to reach their appropriate and uniquely designed goals for success, Miss. Code Ann. § 37-23-5, and for establishing regulations for school districts throughout Mississippi to operate their programs in compliance with the IDEA. Miss. Code Ann. § 37-23-135(1). Pursuant to federal law, MDE has the ultimate responsibility to ensure that local school districts implement

and comply with the IDEA and that all eligible children receive a free appropriate public education.  20 U.S.C. § 1412(a)(11)(A).

## CLASS ACTION ALLEGATIONS

12.   Plaintiff brings this action on behalf of himself and all those similarly situated pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

13.   The class is defined as follows:

All JPS students with disabilities who were included as class members in the September 2010 IDEA administrative complaint styled as *A.M v. Jackson Public Schools,* or who would currently meet the definition of a class member as established in that administrative matter, which consists of IDEA eligible students who manifested behavior issues and were subjected to three or more disciplinary removals[1] from JPS and/or placement in an alternative school setting in JPS during the course of a single school year.

14.   The size of this class is so numerous that joinder of all members is impracticable. During the 2010-2011 school year, there were over 3,000 students with disabilities receiving special education services in JPS.  Hundreds of these students were subjected to three or more disciplinary removals involving out-of-school suspension ("OSS"), in-school suspension ("ISS"), undocumented and illegal school removals, and/or placement in JPS's alternative school.  Since 2010-2011 JPS has suspended students with disabilities at even higher rates, adding more students to the proposed class.

15.   There are questions of law and fact common to the class, such as whether the Defendant's failure to properly execute its general supervisory responsibilities, including its monitoring and enforcement obligations, has violated Plaintiff's right under the IDEA to receive a free appropriate public education in accordance with the requirements of the IDEA.

---

[1] Disciplinary removals are defined as in-school suspension, out-of-school suspension, and undocumented illegal removals from school.

16.     The claims of the Plaintiff are typical of the claims of the class.  As a result of Defendant's unlawful policies and practices, Plaintiff and the class he seeks to represent have been denied the benefits of a program of special education and related services as required by the IDEA.

17.     The Plaintiff will fairly and adequately represent the interests of the class because he seeks relief on behalf of the class as a whole and has no interests antagonistic to other members of the class.  The Plaintiff possesses a strong personal interest in the subject matter of the lawsuit, and is represented by experienced counsel with expertise in special education and disability law, class action litigation, and civil rights proceedings.

18.     The Defendant has acted and refused to act on grounds generally applicable to the class in that Defendant's unlawful failure to properly exercise its general supervisory responsibilities, including its monitoring and enforcement obligations, over JPS has affected all class members by denying them the special education and related services guaranteed to them by the IDEA.  Accordingly, final injunctive and declaratory relief is appropriate for the class as a whole.

### STATUTORY FRAMEWORK

19.     The IDEA requires that a state provide a free appropriate public education to all students with disabilities, including children with disabilities who have been suspended or expelled from school.  20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101.  The IDEA establishes a system of procedural and substantive requirements to which the state educational agency ("SEA") must adhere to ensure that each child with a disability receives a free appropriate public education.  MDE is the SEA for the State of Mississippi.

20.     MDE must ensure that all eligible students receive an IEP that is developed, reviewed and revised to confer meaningful educational benefit. 20 U.S.C. § 1412(a)(4); 20 U.S.C. § 1414(d). The IEP must include, among other things, a statement of the child's present levels of academic achievement and functional performance, a statement of measurable annual goals, a statement of the special education and related services, and supplementary aids and services to be provided to the child to help him/her participate in the general curriculum and make progress in the general curriculum and toward achieving his/her annual goals. 20 U.S.C. § 1414(d)(1)(A)(i). The child's IEP team is required to review the child's IEP periodically to determine whether the annual goals for the child are achieved and revise the IEP as appropriate to address any lack of progress toward annual goals and in the general curriculum. 20 U.S.C. § 1414(d)(4).

21.     MDE is obligated to ensure that children with disabilities are provided with the necessary supplementary aids and services to allow them to be educated in their LRE, meaning that children with disabilities should receive services in a setting where they are able to interact with nondisabled children to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A).

22.     MDE must ensure that IEPs include consideration of positive behavioral interventions and supports for students who exhibit behavior problems that impede their learning or that of others. 20 U.S.C. § 1414(d)(3). MDE must also ensure that children who are subject to disciplinary removals that amount to more than ten days for behavior that is a manifestation of their disability receive a functional behavioral assessment ("FBA"), behavior intervention plan ("BIP") and modifications to address the behavior violation so that it does not recur. 20 U.S.C. § 1415(k)(1)(D)(ii).

23.     MDE must ensure that for children 14 years of age and older, their IEP includes a transition plan that identifies the child's post-secondary goals and identifies the services needed to assist the child in reaching those goals.  34 C.F.R. § 300.320(b); State Policies Regarding Children with Disabilities under the Individuals with Disabilities Education Act Amendments of 2004, State Board Policy 7219, § 300.320(b).

24.     MDE must ensure that ESY services are available and provided to those children deemed eligible for ESY services.  34 C.F.R. § 300.106; State Policies Regarding Children with Disabilities under the Individuals with Disabilities Education Act Amendments of 2004, State Board Policy 7219, § 300.106; State Board of Education Policy 7212.

25.     MDE must ensure that children with disabilities are afforded the procedural safeguards described by the IDEA when disciplinary action is contemplated.  Prior to being subject to a disciplinary removal lasting more than ten days, a district must convene a manifestation determination review ("MDR") to review all relevant information in the student's file, including the IEP, teacher observations and information provided by the parent/guardian to determine if the conduct in question was caused by, or had a direct and substantial relationship to the child's disability or if the conduct in question was the direct result of the school's failure to implement the IEP.  If it is determined that the behavior is a result of the school's failure to implement the IEP, immediate action must be taken to remedy any deficiencies with the school's implementation of the IEP.  20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e).

26.     The IDEA also requires the state to examine data from local school districts to determine if significant discrepancies exist in the rates of suspensions and expulsions of children with disabilities.  If discrepancies exist, the state must review and revise its policies, procedures and practices relating to the development of IEPs, the use of positive behavioral interventions

and supports, and procedural safeguards to ensure that the state is in compliance with the IDEA. 20 U.S.C. § 1412(a)(22); 34 C.F.R. § 300.170.

27.     As the SEA, MDE is ultimately responsible for ensuring that JPS follows the mandates of the IDEA and provides all eligible students with FAPE.  20 U.S.C. § 1412(a)(1), (11)(A).  MDE is responsible for implementing policies and procedures to ensure that local educational agencies ("LEA") are monitored for implementation and compliance with the IDEA. When the SEA identifies areas of noncompliance, it must ensure that noncompliance is corrected as soon as possible, and in no case later than one year after the State's identification of noncompliance.  34 C.F.R. § 300.600(e).  The SEA is also responsible for providing FAPE directly to students when an LEA is unable to establish and maintain programs of FAPE in compliance with the IDEA.  20 U.S.C. § 1413(g); 34 C.F.R. § 300.227(a)(1)(ii).

28.     The SEA must also establish procedures for individuals to file complaints with the SEA regarding individual and systemic violations of the IDEA by an LEA.  The SEA is required to investigate these complaints, and, if noncompliance is found, must ensure that appropriate corrective action is taken within one year to redress both individual and systemic IDEA violations and ensure that appropriate services are provided to children with disabilities thereafter.  34 C.F.R. §§ 300.151-153, § 600(e).

**SYSTEMIC ALLEGATIONS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

29.     In September 2010, Plaintiff[2] filed a state administrative complaint with MDE against JPS pursuant to 34 C.F.R. §§ 300.151-153.  The complaint alleged several systemic IDEA violations by JPS involving the provision of FAPE to students with disabilities who had been subjected to three or more disciplinary removals and/or placement in JPS's alternative

---

[2] The September 8, 2010 administrative complaint included several other named petitioners who have moved, left the District or are not otherwise named in this Complaint.

school. MDE investigated Plaintiff's allegations as a systemic state administrative complaint on behalf of the named petitioners[3] and all other similarly situated special education students who manifest behavioral issues and are subject to three or more disciplinary removals from school and/or placement in an alternative school setting. MDE issued its findings and decision on November 22, 2010, substantiating all of the individual and systemic allegations contained in the administrative complaint. More than one year has elapsed, and MDE has failed to ensure correction of the individual and systemic violations. As a result of the systemic claims raised in the original state administrative complaint and in this Complaint, Plaintiff is not required to exhaust administrative remedies available under the IDEA. Given that the administrative system cannot provide the Plaintiff-class with the requested class-wide, systemic declaratory and injunctive relief, exhaustion would be futile.

## STATEMENT OF FACTS

30. On September 8, 2010, Plaintiff E.H. filed a systemic administrative complaint with MDE on behalf of himself and a class of similarly situated JPS students with disabilities who had experienced three or more disciplinary removals and/or placement in an alternative school setting. Plaintiff and the other petitioners filed the complaint to address individual and systemic violations of the IDEA by JPS which resulted in the denial of FAPE to the Plaintiff, the petitioners and all similarly situated students. The administrative complaint alleged the following individual and systemic violations of the IDEA by JPS:

> a) Denial of FAPE by failing to provide petitioners and similarly situated students with appropriate levels of related services;

---

[3] Use of the term "petitioners" throughout this Complaint is intended to refer to the individual students representing a class of IDEA eligible students with behavioral issues who were subjected to three or more disciplinary removals and/or placement in an alternative school setting in JPS who filed the original administrative complaint on September 8, 2010.

b) Denial of FAPE by failing to comply with the IDEA's discipline regulations with regard to FBAs, BIPs, and MDRs;

c) Denial of FAPE by failing to confer meaningful educational benefit;

d) Denial of FAPE by failing to comply with the substantive and procedural requirements governing the development and implementation of IEPs;

e) Denial of FAPE by failing to provide educational services for petitioners and similarly situated students in the least restrictive environment;

f) Denial of FAPE by failing to provide petitioners and similarly situated students with necessary and appropriate transition services;

g) Denial of FAPE by failing to provide petitioners and similarly situated students with necessary and appropriate ESY services.

Plaintiff, the other petitioners and a class of similarly situated students alleged that these violations resulted in a cycle of unlawful removals from the classroom environment and punishment for behaviors related to their disabilities, and deprived them of the ability to make positive academic gains. Plaintiff, other petitioners and the class sought widespread systemic relief to reform the manner in which JPS administers its special education program.

31. As required by federal law, MDE investigated these allegations and issued a report containing its findings and decision on November 22, 2010. MDE's investigation confirmed that JPS had violated the rights of E.H. and the other named petitioners. MDE's investigation also confirmed that the IDEA violations were systemic throughout JPS and resulted in the denial of FAPE to the named petitioners and all similarly situated students. MDE specifically noted the following individual and systemic violations of the IDEA:

a) JPS denied FAPE to petitioners and all similarly situated students by failing to provide them with an appropriate level of related services to address their behavioral needs and goals. Despite documented behavior concerns, JPS failed to provide many students with *any* related services.

b) JPS denied FAPE to petitioners and similarly situated students by conducting inadequate FBAs and formulating inappropriate BIPs. MDE further documented that JPS failed to implement BIPs, and students did not obtain any benefit from the BIPs created by JPS.

c) JPS denied FAPE to petitioners and similarly situated students by failing to meaningfully update and revise IEPs. JPS failed to gather, summarize and review meaningful data necessary to monitor behavioral progress. Consequently, students obtained absolutely no benefit from their IEPs and BIPs and made no behavioral progress, amounting to a denial of FAPE.

d) JPS violated the procedural rights of petitioners and similarly situated students by failing to conduct MDRs in conformance with the IDEA procedural safeguards, and consequently subjected petitioners and similarly situated students to unlawful disciplinary action and restrictive placements.

e) JPS denied FAPE to petitioners and similarly situated students by failing to collect information and data on student academic and behavioral performance, resulting in petitioners and similarly situated students failing to obtain any meaningful educational benefit from their IEPs.

f) JPS denied FAPE to petitioners and similarly situated students by failing to comply with the requirements for developing and implementing IEPs. In

particular, JPS failed to properly align students' academic goals and objectives with their actual levels of performance; failed to consider positive behavioral interventions and supports to improve behavior; failed to properly review student performance; and failed to revise IEPs as needed to address a lack of academic or behavioral progress.

g) JPS denied FAPE to petitioners and similarly situated students by failing to provide them with the necessary supports and related services to serve them in their LRE.  MDE found that this created a disparity in some students being placed at the JPS alternative school or other restrictive settings.

h) JPS denied FAPE to petitioners and similarly situated students by failing to provide them with adequate and meaningful transition planning and supports.

i) JPS denied FAPE to petitioners and similarly situated students by failing to appropriately evaluate them to determine the need for ESY services and by failing to provide appropriate ESY services when needed.

32.     MDE ordered JPS to submit to MDE within 30 days an improvement plan outlining the actions JPS would implement to correct the systemic violations of the IDEA.  MDE also ordered JPS to take corrective action with regard to the named petitioners and provide them with compensatory services.   In order to facilitate JPS's development of an appropriate corrective action plan ("CAP") and provision of compensatory services, MDE appointed a technical advisor to assist JPS with developing and implementing the corrective action plan.

33.     Despite MDE's directive that JPS consult with the technical advisor in developing a corrective action plan and providing compensatory services, JPS refused to collaborate with the

technical advisor and deliberately excluded the technical advisor from implementation of most of the proposed corrective actions in the CAP it submitted to MDE in late December 2010.

34.    JPS's proposed corrective action plan suffered from several glaring deficiencies, among them a failure to acknowledge MDE's findings; a failure to address several of MDE's findings and required corrective actions; a failure to acknowledge that MDE's findings substantiated systemic, and not just individual, violations of the IDEA; and an outright refusal to follow the corrective actions prescribed by MDE.

35.    Despite having the obligation and authority to do so under state and federal law, MDE took no action against JPS for submitting a proposed CAP that manifested JPS's open defiance and refusal to comply with federal law.

36.    MDE took no action to ensure JPS produced a CAP that ensured the provision of FAPE to E.H. and the class of similarly situated students.

37.    Upon information and belief, MDE submitted JPS's proposed CAP to the technical advisor for review sometime in January or February 2011.  Upon information and belief, the technical advisor rejected JPS's CAP and provided MDE with substantial written revisions to address the deficiencies in JPS's CAP.  MDE declined to adopt the technical advisor's recommendations and instead allowed JPS to proceed with implementing a CAP that was not actually capable of resolving the systemic IDEA violations that MDE had identified.

38. Despite MDE's direction to JPS to work with the technical advisor, JPS refused to do so, going so far as to deny the technical advisor access to records and school personnel and asking the technical advisor to leave JPS's premises.  MDE acquiesced to this refusal and took no further action against JPS to remedy the noncompliance, despite having the authority and

obligation to do so under state and federal law.  MDE took no action to ensure the provision of FAPE to E.H., the named petitioners or any other similarly situated students during this time.

39.      Instead of taking immediate action to remedy the deficiencies in JPS's submitted CAP, MDE waited until late May 2011 – six months after it issued its findings – to request that the technical advisor conduct a targeted review of the original named petitioners to assess whether JPS had corrected the individual IDEA violations.  The technical advisor issued a 151 page report in July 2011 detailing numerous ongoing IDEA violations for all of the named petitioners, including E.H., in the areas of FBAs, BIPs, related services, educational benefit and transition services.

40.      In August 2011 – nearly one year after receiving the original administrative complaint – MDE ordered JPS to revise its deficient CAP.   JPS submitted a revised CAP on September 9, 2011, and again in defiance of MDE, excluded the technical advisor from all of its corrective action activities.  Despite having the authority and obligation to do so under state and federal law, MDE failed to take any action to compel JPS to work with the technical advisor and correct the individual and systemic violations of the IDEA.  MDE took no action to ensure the provision of FAPE to E.H., the named petitioners and similarly situated students during this time.

41.      On September 26, 2011, MDE submitted a written review of JPS's revised CAP that detailed numerous deficiencies with JPS's CAP and ordered JPS to collaborate extensively with the technical advisor to ensure correction of the individual and systemic violations of the IDEA.  MDE specifically noted JPS's resistance to work with the technical advisor over the past several months.   Nonetheless, JPS continued to refuse to work with the technical advisor throughout the fall of 2011 and thereby refused to implement MDE's revised CAP.  Despite having the authority and obligation under state and federal law to do so, MDE failed to take any

action to compel JPS to implement an appropriate CAP and correct the individual and systemic violations of the IDEA.  MDE took no action to ensure the provision of FAPE to E.H., the named petitioners and similarly situated students during this time.

42.     In mid-November 2011, MDE conducted a follow-up monitoring visit to determine whether JPS had taken sufficient corrective action to remedy the individual and systemic IDEA violations it had identified in its November 22, 2010 investigation report and findings. MDE issued a follow-up monitoring evaluation report from this new visit on January 13, 2012.  The report detailed the same individual and systemic violations for virtually all of the original named petitioners still attending school in JPS, including E.H.  The named petitioners' IEPs continued to suffer from the same deficiencies identified by MDE over one year earlier.   In over one year, JPS had failed to correct individual violations, and had failed to make any systemic improvements to cure the District's systemic violations of the IDEA.  Despite having the authority and obligation under state and federal law to do so, MDE failed to take any action to compel JPS to correct the individual and systemic violations of the IDEA.  MDE took no action to ensure the provision of FAPE to E.H., the named petitioners and similarly situated students during this time.

43.     Following MDE's issuance of its January 13, 2012 follow-up report, Plaintiff's counsel also informed MDE of ongoing individual and systemic violations within JPS, and sought MDE's assistance in correcting these violations.  MDE refused to take any action to remedy the individual and systemic violations.  For instance, MDE agreed to attend the IEP meetings for some of the petitioners from the state administrative complaint, including Plaintiff E.H. However, MDE refused to participate in these meetings, and remained silent, even while JPS staff made decisions and recommendations that clearly violated federal law.  Even more

confounding, MDE invited the technical advisor to attend some of these IEP meetings, but instructed the technical advisor to remain silent throughout the IEP meeting and refrain from offering recommendations and technical advice. MDE further declined to order JPS officials to adopt specific recommendations from the technical advisor to remedy the denial of FAPE to individual students. MDE limited its enforcement action to referring JPS to MDE's Office of Accreditation to initiate proceedings to strip JPS of its accreditation – an action that would do absolutely nothing to ensure the provision of FAPE to E.H., the named petitioners and other similarly situated students.

44.     MDE conducted another follow-up monitoring visit on April 18-20, 2012 and issued a report on May 15, 2012. This report documented that JPS had made some minor effort to develop policies and procedures and provide training to staff. However, a review of student files indicated that the District had failed to implement its newly promulgated policies and procedures, and as a result, the District still had not resolved the original findings of individual and systemic noncompliance dating back to November 2010. MDE noted that the specific areas covered by JPS's new policy development and training were "lacking or nonexistent" in the student files reviewed. MDE noted that this was a "clear indication" that JPS's ongoing noncompliance is attributable to a complete failure on the part of JPS to implement its own policies and procedures. MDE's report also found that JPS was suspending students with disabilities at increasingly disproportionate rates and that the disproportionality was actually greater than it was in 2010 when Plaintiff filed the underlying administrative complaint.

45.     On April 26 and May 21, 2012, the Office of Accreditation held a hearing to decide whether JPS should lose its accreditation. At the conclusion of the hearing, the Office of Accreditation decided to give JPS until November 1, 2012 to come into compliance with the

IDEA. The Office, which is housed within MDE, made this determination despite testimony from the technical advisor that JPS's violations are so systemic and JPS is so far behind in implementing appropriate corrective action that it will take JPS several years to obtain full compliance.

46.     MDE's monitoring and enforcement continues to be insufficient and inadequate. Although MDE documented in its May 15, 2012 report that JPS had failed to implement any policies and procedures to correct its individual and systemic IDEA violations, and despite JPS's failure to develop and implement an adequate CAP for nearly two years, MDE's corrective action at this point is limited to ordering JPS to produce yet another CAP, rather than ordering JPS to implement an actual plan created in collaboration with the technical advisor. JPS has until July 15, 2012 to produce this new CAP.

47.     MDE has also acquiesced to JPS's resistance to work with the technical advisor, and has allowed the technical advisor's role and authority to remain ambiguous, and thus ineffective. Upon information and belief, JPS is under no requirement from MDE to adopt the recommendations of the technical advisor, and is free to continue to disregard the technical advisor's recommendations, just as it has done for the past two years.

48.     Since the Office of Accreditation issued its decision on or about May 21, 2012, JPS has undertaken several purported corrective actions that will actually exacerbate JPS's systemic violations under the IDEA. For instance, despite repeated admonishment from MDE that removing students with disabilities from the classroom and placing them in restrictive segregated environments violates the LRE mandate of the IDEA, in its June 4, 2012 Weekly Report to MDE, JPS proposed creating two new segregated settings for students with disabilities for the next school year. One such segregated setting is a day treatment program, isolated from

other mainstream schools within JPS, that would serve only students with emotional disabilities. Students in this day treatment program would not even have the benefit of receiving live instruction and would not have a real, much less a highly qualified, teacher in their classroom. Instead, JPS intends to provide some of its most academically vulnerable students with instruction via video streaming from other classrooms. In its June 4, 2012 Weekly Report, the District also proposed creating a separate alternative school program to serve only students with disabilities.

49.     Further, JPS informed MDE in its June 4, 2012 Weekly Report that it plans to place full time psychologists and behavioral support specialists in the alternative school and day treatment program to provide students with disabilities with more intensive behavioral interventions.  However, JPS has not taken any action to make these vital services and the increased staffing available to students in regular education classrooms and regular neighborhood school settings to prevent their removal to more restrictive settings.  Rather than implementing measures to improve student behavior and reduce the need for segregated placements, JPS has merely expanded the array of segregated settings it may use, and has thus further incentivized the exclusion of students with disabilities from the classroom.

50.     MDE's failure to hold JPS accountable for systemic violations of the IDEA is exacerbated by deficiencies in MDE's monitoring.  Despite finding these violations to be systemic, MDE has limited its monitoring to a review of a small number of student files on each on-site visit.  The District has more than 3,000 students with disabilities and hundreds who fall within the class definition herein.  However, during their monitoring visits, MDE typically pulls less than 10 student files to fulfill its "random monitoring" to assess JPS's level of systemic noncompliance.  This is inadequate for MDE to gauge JPS's compliance with the IDEA and

20

amounts to a violation of MDE's duty to monitor and supervise JPS to ensure compliance with the IDEA. Systemic violations will continue unabated throughout JPS if MDE continues to abdicate its monitoring and enforcement mandate.

**Plaintiff E.H.**

51.     E.H. is 16 years old and will start the tenth grade next year at JPS. E.H. is a very talented athlete, and hopes to attend college upon completing high school.

52.     JPS has denied FAPE to E.H. for several years, as demonstrated by his lack of academic and behavioral progress over several years. MDE has been aware of JPS's failure to provide E.H. with FAPE since at least September 2010. However, MDE has failed to adequately fulfill its monitoring, supervisory and enforcement duties to ensure that E.H. is provided with FAPE.

53.     At the time that MDE concluded its investigation into the September 8, 2010 administrative complaint, MDE affirmed the following allegations made by E.H. in the administrative complaint:

> a) Despite exhibiting significant behavioral problems throughout the 2008-2009 and 2009-2010 school years resulting in numerous out-of-school removals and placement in a restrictive self-contained classroom, JPS failed to provide E.H. with any related services to address his behavior, and failed to conduct an FBA and develop an appropriate BIP for him.
>
> b) JPS failed to provide E.H. with any meaningful educational benefit from his IEP. E.H.'s records showed that he had made virtually no academic progress over several years. His initial evaluation from 2005 stated that his reading skills were at a 1.3 grade level and his math skills were between a 2.8 and 3.5 grade level.

Three years later, his IEP stated that his reading skills were at a 2.3 grade level and his math skills were at a 2.6 grade level. During that three year period, E.H. increased his reading skills by only 1 grade level and his math skills actually regressed. E.H. also fell behind due to removals from his regular education classes and placement in a self-contained classroom where he did not receive appropriate instruction.

c) JPS failed to comply with the IDEA's procedural and substantive requirements governing the development and implementation of IEPs. In particular, JPS failed to align E.H.'s goals with his present levels of performance. During the 2008-2009 school year, E.H.'s annual academic goals stated that he would learn the 6th grade curriculum requirements, even though his present levels of performance in reading and math were at a 2.3 and 2.6 grade level respectively. The same discrepancies appeared again on his 2009-2010 and 2010-2011 IEPs, even after he failed all of his major subjects during the 2008-2009 school year and earned 2 D's and 3 F's in his five major subjects during the 2009-2010 school year. JPS also failed to consider the use of positive behavioral interventions and supports in his IEP, despite lengthy documentation that behavior was a significant factor affecting his education. JPS also failed to meet and revise E.H.'s IEP to address his clear lack of academic and behavioral progress.

d) JPS's failure to provide appropriate academic and related services resulted in E.H.'s suspension from school and placement in a restrictive classroom setting, and placed E.H. at risk for future restrictive placements, in violation of the IDEA's mandate that he be served in his LRE.

e) JPS denied E.H. ESY services during the summer of 2009 despite a clear need for ESY services.

54.    JPS continued to violate E.H.'s rights throughout the 2010-2011 and 2011-2012 academic years, as confirmed by MDE's most recent monitoring report from April 18-20, 2012 documenting JPS's ongoing failure to correct the individual and systemic violations documented in JPS's November 22, 2010 findings.

55.    Despite a directive from MDE in November 2010 to provide E.H. with compensatory related services, JPS did not even include any related services on his IEP until February 2012, and only did so after Plaintiff's counsel made several requests.

56.    JPS drafted E.H.'s 2011-2012 annual IEP on August 22, 2011.  Despite having been vindicated in the administrative process, E.H.'s educational program suffered from the same deficiencies first noted in the September 2010 complaint such as (1) a failure to ascertain his present levels of performance; (2) a failure to include any related services; (3) a failure to provide appropriate transition services; (4) a failure to align E.H.'s goals with his present levels of performance; and (5) a failure to confer meaningful educational benefit.

57.    Despite continuing documentation of behavioral issues, to date JPS has failed to complete an FBA or provide E.H. with an appropriate BIP.  And, to date, MDE has failed to ensure that JPS provides E.H. with these necessary services. As a result, E.H. lost the opportunity to make behavioral progress for another academic year.

58.    JPS has also failed to provide E.H. with appropriate ESY services and MDE has failed to ensure the provision of such services.  JPS determined that E.H. was eligible for ESY services for the 2012 summer session, and determined that he needed to attend the summer session 5 days per week for three weeks, for a total of 15 days of instruction.  However, for no

apparent reason, JPS failed to transport E.H. to his ESY services for the first six days of the summer session.  E.H. was able to make up two of these days, but still lost 4 days of ESY instruction due to JPS's failure to transport him for services.

59.     E.H. continues to read somewhere between a 2nd and 3rd grade level, and JPS has failed to properly revise E.H.'s IEP to ensure that he receives FAPE.

60.     By MDE's own admission, E.H. has not received FAPE for the past two academic years. E.H. will continue to be denied FAPE unless MDE properly exercises its monitoring and enforcement authority, as it is required to do under the IDEA.

## CAUSE OF ACTION

## COUNT I

### INDIVIDUALS WITH DISABILITIES EDUCATION ACT
### 20 U.S.C. §§ 1412(a)(1), (11)(A)

61.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

62.     The IDEA specifies that the State Educational Agency is responsible for ensuring that the requirements of the Act are met.  20 U.S.C. § 1412(a).

63.     The State Educational Agency must monitor implementation of the Act, including utilizing appropriate enforcement mechanisms to ensure compliance with the IDEA.  20 U.S.C. § 1412(a)(11); § 1413(d), (g); 34 C.F.R. § 300.600(a).

64.     In exercising its general supervisory responsibilities, including monitoring, the State must ensure that noncompliance is corrected as soon as possible, and in no case later than one year after the identification of noncompliance.  34 C.F.R. § 300.600(e).

65.     As set forth above, Defendant has failed to comply with its general supervisory and enforcement responsibilities by failing to appropriately monitor JPS and to ensure that JPS

takes immediate and effective measures to eliminate individual and systemic violations of the IDEA, as mandated under the IDEA.  As a result of Defendant's unlawful acts, Plaintiff and the class he seeks to represent have been denied the substantive guarantees of the IDEA.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court:

1. Assume jurisdiction over this matter;

2. Certify this case as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) with the class as defined above and the below signed counsel appointed as class counsel;

3. Declare unlawful Defendant's failure to comply with the mandates of the IDEA as authorized under 28 U.S.C. § 2201;

4. Enter a preliminary and permanent injunction enjoining Defendant from subjecting members of the Plaintiff class to practices that violate their rights under the IDEA and compelling Defendant to fulfill its duties under the IDEA;

5. Award to the Plaintiff the reasonable costs and attorney's fees incurred in the prosecution of this action pursuant to 20 U.S.C. § 1415(i)(3)(b);

6. Award such other equitable and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this the 10th day of July, 2012.

VANESSA J. CARROLL, MS Bar No. 102736
vanessa.carroll@splcenter.org
CORRIE COCKRELL, MS Bar No. 102376
corrie.cockrell@splcenter.org
JODY E. OWENS, II, MS Bar No. 102333
jody.owens@splcenter.org
Southern Poverty Law Center
111 E. Capitol St., Suite 280
Jackson, MS 39201
601-948-8882 (telephone)
601-948-8885 (fax)

JERRI KATZERMAN
AZ Bar No. 013895*
jerri.katzerman@splcenter.org
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
334-956-8320 (telephone)
334-956-8481 (fax)
*Pro hac vice motion to be filed

JIM COMSTOCK-GALAGAN
LA Bar No. 05880*
jgalagan@sdlcenter.org
Southern Disability Law Center
4431 Canal St.
New Orleans, LA 70119
504-486-8982 (telephone)
504-486-8947 (fax)
*Pro hac vice motion to be filed

WENDELL HUTCHINSON, MS Bar No. 99178
whutchinson@drms.ms
Disability Rights Mississippi
210 E. Capitol St., Suite 600
Jackson, MS 39201
601-968-0600 (telephone)
601-968-0665 (fax)